UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Frankfort)

| | | |
|---|---|---|
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC., | ) ) ) ) | |
|     Plaintiff, | ) ) | Civil Action No. 3: 08-58-DCR |
| V. | ) ) | |
| TODD HOLLENBACH, in his Official Capacity as Treasurer of the Commonwealth of Kentucky, | ) ) ) ) | **MEMORANDUM OPINION AND ORDER** |
|     Defendant. | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Following remand, this matter is pending for consideration of cross motions for summary judgment by Plaintiff American Express Travel Related Services Company, Inc. ("AmEx") and Defendant Todd Hollenbach, in his official capacity as Treasurer of the Commonwealth of Kentucky ("the Treasurer"). [Record Nos. 78, 88] Both parties argue that they are entitled to summary judgment on AmEx's remaining constitutional claims. For the reasons discussed below, the Treasurer's motion will be granted and AmEx's motion will be denied.

**I.**

The Court again adopts the Sixth Circuit's summary of the facts underlying this case.

> American Express is in the business of issuing traveler's checks, which are preprinted "checks" in fixed dollar amounts ranging from $20-100. Upon the sale of a traveler's check, either by American Express directly or through a third-party vendor, American Express receives the funds tendered for the check and records the serial number of the check, its amount, and the date and place of sale;

-1-

> thereafter, American Express will honor the check in its full amount upon presentation by a holder in due course. American Express sells traveler's checks to its customers at face value, that is, free of any service charges or fees. It profits from this business by investing the funds it receives from the sale of traveler's checks, which it retains until the checks are redeemed. Traveler's checks have no expiration date, and although the majority of purchasers cash their traveler's checks within one year, American Express relies on a small percentage of traveler's checks remaining uncashed for several years. It can therefore invest some funds from outstanding traveler's checks in long-term, high-yield investments, up until state property law imposes a presumption of abandonment on uncashed traveler's checks. At that point, American Express must remit the outstanding funds to the state. Until recently, all fifty states followed the presumption that a traveler's check was abandoned if still outstanding more than fifteen years after issuance, as recommended in the Uniform Unclaimed Property Act.
>
> In 2006, the Kentucky General Assembly shortened the presumptive abandonment period for traveler's checks to seven years as part of its budget legislation for fiscal years 2007 and 2008 (the "2006 amendment"). American Express claims that the legislation will render its traveler's check business in Kentucky unprofitable, as the shorter presumptive abandonment period curtails its ability to place the funds from uncashed traveler's checks in long-term investments. Consequently, American Express challenged the 2006 amendment in Kentucky state court under both the Kentucky Constitution and the Federal Constitution. The Franklin Circuit Court invalidated the enactment for failure to comply with the procedure for amending legislation required by Section 51 of the Kentucky Constitution, but it did not consider American Express's other claims of unconstitutionality. . . .
>
> In 2008, the Kentucky General Assembly again passed legislation amending [Kentucky Revised Statutes] section 393.060 to reflect a seven-year presumptive abandonment period for traveler's checks (the "2008 amendment"). The enactment was incorporated into the budget legislation for fiscal years 2009 and 2010, as well as a separate bill designed to cure the procedural defects identified by the Franklin Circuit Court with respect to the 2006 amendment. In response, American Express filed [the instant] suit . . . .

*Am. Express Travel Related Servs. Co. v. Hollenbach*, 641 F.3d 685, 686-88 (6th Cir. 2011) (footnote and citations omitted).

AmEx sought declaratory and injunctive relief, arguing that the 2008 amendment violated the Due Process Clause of the Fourteenth Amendment, the Contract Clause, and the Takings Clause of the Fifth and Fourteenth Amendments.[1]  The Court granted summary judgment in favor of AmEx after concluding that the 2008 amendment violated principles of substantive due process.  *Am. Express Travel Related Servs. Co. v. Hollenbach*, 630 F. Supp. 2d 757, 760-64 (E.D. Ky. 2009).  The Court did not decide AmEx's remaining constitutional challenges.  *See id.* at 764-66.

On appeal, the Sixth Circuit held that the 2008 amendment could withstand rational basis review and thus did not violate the Due Process Clause.[2]  The appellate court declined to consider AmEx's other allegations, explaining:

> We are hesitant to decide these potentially meritorious claims without the benefit of a definitive ruling from the district court, which can expand the evidentiary record or request additional briefing or argument from the parties if needed. Therefore, remand is appropriate for the determination of whether the 2008 amendment effects an unconstitutional taking, unconstitutionally impairs American Express's contractual obligations, or is unconstitutionally retroactive in application.

*Hollenbach*, 641 F.3d at 694.

Following remand, AmEx was granted leave to file an amended complaint.  [Record No. 84]  The Second Amended Complaint contained two new counts, each of which alleged a

---

[1] AmEx also asserted violations of the Kentucky Constitution.  Those claims were dismissed on abstention grounds and are not at issue here.  *See Hollenbach*, 641 F.3d at 692 n.3 (noting that dismissal of the state-law claims was proper "because federal courts lack the power to enjoin a violation of state law" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984))).

[2] The Sixth Circuit found that "Kentucky has a legitimate interest in enacting legislation that allows the state to take custody of property that is presumed abandoned."  *Hollenbach*, 641 F.3d at 693 (citing *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 240 (1944)).

violation of the Commerce Clause. [*See* Record No. 85, pp. 13-14, 17-18]  AmEx also supplemented its due process claims in light of the Sixth Circuit's ruling. [*Id.*, pp. 9-10, 14-15] Each party now seeks summary judgment on AmEx's remaining claims.

## II.

Summary judgment is appropriate when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* (c)(1).  In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To avoid summary judgment, the nonmoving party must do more than cast some "metaphysical doubt" on the material facts. *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002) (citing *Matsushita*, 475 U.S. at 586).  Instead, it must present "significant probative evidence" of a genuine dispute in order to defeat the motion for summary judgment. *Id.*  With this standard in mind, the Court turns to AmEx's various constitutional challenges.

### A.     **Substantive Due Process (Retroactive Application)**

AmEx first contends that application of the seven-year abandonment period to existing traveler's checks ("TCs") violates substantive due process.  The Treasurer initially denied that the law was retroactive, arguing instead that it "merely changes the date in the future when [AmEx] has to remit" uncashed TCs.[3]  [Record No. 88-1, p. 5]  He appears to abandon this

---

3      It is undisputed that the legislation applies "to all issued and outstanding traveler's checks, not just those issued on or after the date it takes effect." [Record No. 88-1, p. 6 n.3]

argument in his reply, however, and the Court assumes for present purposes that the amendment is retroactive.[4]

The next question is whether retroactive application of the statute violates due process. "In general, due process is satisfied 'simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.'" *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 550 (6th Cir. 2001) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730 (1984)). As AmEx points out, "a justification sufficient to validate a statute's prospective application under the [Due Process] Clause 'may not suffice' to warrant its retrospective application." *Landgraf*, 511 U.S. at 266 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976)).

Nevertheless, AmEx fails to show that subjecting existing TCs to the law is any less rational than prospective application of the seven-year period. It asserts simply that "[i]f the purpose of retroactively applying the shortened abandonment period is to protect the property rights of owners and provide a centralized search location, the Legislation fails so miserably as to be irrational," because "the bulk of the outstanding TCs at any time are those that have been issued within zero to seven years from any particular date." [Record No. 89, p. 6] By its own terms, this argument is not specific to AmEx's retroactivity claim, and it has already been rejected by the Sixth Circuit. *See Hollenbach*, 641 F.3d at 693-94. AmEx offers no other reason

---

[4] A law is retroactive if it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994). Under this definition, the challenged amendment, which alters the length of time AmEx may retain uncashed TCs sold up to seven years earlier, has retroactive effect. *See Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 364 (3d Cir. 2012) (describing similar amendment to New Jersey's abandoned-property law as having "retroactively reduced the period after which travelers checks are presumed abandoned from fifteen years to three years").

why the rational basis articulated by the Sixth Circuit — *i.e.*, assumption of abandoned property for safekeeping — does not equally support retroactive application of the statute.[5] Its remaining Due Process claim therefore fails.

> **B.    Contract Clause**

AmEx's Contract Clause claim is likewise unavailing. The Contract Clause prohibits states from "pass[ing] any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. In evaluating a claim under the Contract Clause, the Court "first ask[s] whether the change in state law has 'operated as a substantial impairment of a contractual relationship.'" *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). This inquiry comprises three subparts: "[1] whether there is a contractual relationship, [2] whether a change in law impairs that contractual relationship, and [3] whether the impairment is substantial." *Id.*

The parties do not dispute that the sale of a TC gives rise to an implied contract between AmEx and the purchaser. Under prior law, AmEx asserts,

> [t]hat implied contract gave AmEx the right to keep the funds for 15 years, when taken by the Commonwealth, or until earlier cashed. That right has been altered. That right [sic] also gave the TC purchaser 15 years within which to demand

---

5    To the extent AmEx maintains that *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), and *United States v. Carlton*, 512 U.S. 26 (1994), restrict retroactivity to short periods, its argument rests on a characterization of the amendment as a revenue-raising measure. [*See* Record No. 89, p. 7 ("Its primary argument for rationality having no merit, the Treasurer can rely only on the revenue-raising aspects of the Legislation for its rational basis.")] Because AmEx has failed to demonstrate that the state's interest in assuming possession of presumptively abandoned property is not a rational basis for the law, as explained above, the Court need not address this contention. Moreover, the Court notes that the Sixth Circuit has found *Apfel* to be of minimal precedential value in light of the fact that "no single rationale was agreed upon by the Court" in that case. *Franklin Cnty.*, 240 F.3d at 552. In addition, the "fundamental fairness" standard AmEx seeks to extrapolate from *Apfel* does not appear to have been adopted by the Supreme Court or Sixth Circuit in later cases involving retroactive application of statutes. [*See* Record No. 78-1, pp. 18-20 & n.11]

> payment by AmEx. That right has also been altered — [the TC purchaser] must now demand payment within seven years. Also altered is AmEx's ability to earn a profit on those funds, since the TCs representing them were issued without fee in reliance on the fact that the law was incorporated into those contracts.

[Record No. 89, p. 5] AmEx further claims:

> It is not hard to imagine that customers expected to be able to cash their checks with AmEx for the statutory period of time in place when they purchased those checks. For instance, the purchaser of a TC in 2001 received the contractual right to present that TC for immediate payment by AmEx until 2016. Such a purchaser, under the [challenged l]egislation, no longer has that right. That is a real right that has been lost by TC purchasers.

[*Id.*, p. 9]

At the outset, the Court rejects AmEx's contention that the new law alters or impairs any contractual rights of TC customers. As alleged in the Complaint, "AmEx's traveler's checks, *by contract*, do not expire." [Record No. 85, p. 5 ¶ 25 (emphasis added); *see also* Record No. 78-3, p. 2 ¶ 5 ("AmEx TCs never expire, and each AmEx TC states, on its face[,] 'American Express Travelers Cheques Never Expire.'")] In other words, the contract with AmEx gives TC customers the right to cash their checks at any time. That right is not disturbed by the change in legislation.

Moreover, with respect to its claimed "right to keep the funds for 15 years" and "ability to earn a profit on those funds," AmEx has not shown that those were terms incorporated into its contracts with TC customers by mutual assent. [Record No. 89, p. 5] Although "the terms to which the contracting parties give assent may be express or implied in their dealings," *Gen. Motors Corp.*, 503 U.S. at 188, nothing suggests that TC customers agreed their checks would be subject to a fifteen-year statutory abandonment period. On the contrary, since the agreement

obligates AmEx to honor TCs upon presentment regardless of their age, customers would have no reason to even be aware of abandoned-property laws governing traveler's checks.

Notwithstanding AmEx's insistence that each of its contracts with TC purchasers automatically incorporated the law in effect at the time of sale, the rule is not that "all state regulations are implied terms of every contract entered into while they are effective." *Id.* at 189. Rather, "[f]or the most part, state laws are implied into private contracts regardless of the assent of the parties only when those laws affect the validity, construction, and enforcement of contracts." *Id.* According to AmEx, "the Treasurer admits [that Kentucky Revised Statutes section] 393.110 prevents a customer from enforcing a TC that, contractually speaking, is valid against AmEx," and the law thus affects the enforcement of contracts between the customer and AmEx.[6] [Record No. 89, p. 9 n.7]  AmEx provides no citation in support of this statement, however, and the Court finds no such concession in the record.  Furthermore, as stated above, AmEx's assertion that the new law harms existing TC customers is without merit.  The Court agrees with the Third Circuit that "the adjustment of the abandonment period merely shortens the time during which Amex can invest the TC funds, without affecting the validity, construction, and enforcement of the contract between Amex and its customers." *Sidamon-Eristoff*, 669 F.3d at 370.

---

6   Section 393.110 directs the Department of the Treasury to "promulgate administrative regulations prescribing the reports which shall be filed with the department by persons holding property presumed abandoned." Ky. Rev. Stat. § 393.110. The related regulation requires that holders of presumably abandoned property transfer that property to the department on November 1 of each year. 20 Ky. Admin. Regs. 1:080 section (1)(3)(a).

Finally, even if AmEx could show that its contracts with TC customers entailed rights or obligations pertaining to the statutory abandonment period, it cannot establish that any impairment was substantial. The substantial-impairment inquiry turns on "'the legitimate expectations of the contracting parties,' and whether the modification imposes an obligation or liability that was unexpected at the time the parties entered into the contract and relied on its terms." *Id.* at 369 (citation omitted) (quoting *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23 (1977)). In weighing the substantiality of an alleged contractual impairment, the Court must consider whether the parties operate in a regulated industry. *Id.* (citing *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983)). "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Id.* Kentucky has regulated the traveler's-check industry since at least 1960. [*See* Record No. 88-1, p. 2 (citing 1960 Ky. Acts 142)] AmEx thus cannot have had a "legitimate expectation[]" that the abandonment period would never change. *Id.* (internal quotation marks omitted). In summary, AmEx has failed to show that the legislation substantially impairs its contractual relationships with TC customers. *See Gen. Motors*, 503 U.S. at 186-87. As a result, its claim under the Contract Clause fails.

**C.     Takings Clause**

AmEx's takings claim also lacks merit. The Takings Clause, applicable to state action through the Fourteenth Amendment, prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V; *see Dolan v. City of Tigard*, 512 U.S. 374,

383-84 (1994). There are two types of takings. A per se taking, "occurs when 'the government physically intrudes upon a plaintiff's property.'" *McCarthy v. City of Cleveland*, 626 F.3d 280, 284 (6th Cir. 2011). A regulatory taking happens "when a governmental enactment leaves a property owner with *no* productive or economically beneficial use of his property or prevents the property owner from enjoying some — but not all — economic uses" of the property. *Id.* (citation and internal quotation marks omitted). AmEx argues that both types of takings are present here.

### 1.     Per Se Taking

AmEx first contends that the legislation operates as a per se taking by "'transform[ing] private property into public property without compensation.'" [Record No. 78-1, p. 30 (quoting *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2602 (2010))] According to AmEx, it "has a vested interest in the funds representing outstanding TCs for a period of 15 years after sale (unless earlier used by the TC owner)," and Kentucky "may not transform these funds into public property simply by declaring them to be so." [*Id.*, pp. 30-31] AmEx does not explain the origin of its purported fifteen-year right to unclaimed TC funds. As the Court has already explained, AmEx's contracts with TC customers do not confer such a right. And to the extent this argument calls into question the state's power to take possession of uncashed TCs under any circumstances, it is without merit. AmEx does not contest the overall validity of Kentucky's abandoned-property laws. [*See* Record No. 89, p. 9 ("AmEx has never claimed a right into perpetuity to keep the funds it owns that represent outstanding TCs.")] In short, the Court finds no per se taking in this case.

## 2. Regulatory Taking

Three factors guide the Court's regulatory-taking analysis: "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986) (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)). For purposes of the second factor, as under the Contract Clause, it is significant that traveler's checks have long been subject to regulation in Kentucky. *See id.* at 227. "'Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.'" *Id.* (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958)); *see also Sidamon-Eristoff*, 669 F.3d at 371. AmEx protests that it could not have foreseen a change affecting TCs that were already outstanding. [Record No. 89, p. 13] But its argument again rests on the supposed right to hold and earn a return on outstanding TC funds for fifteen years [*see id.*] — a right that simply does not exist. [*See* Record No. 85, p. 12 ¶ 60 (alleging that what has been taken is the "right to retain custody of and earn a return on traveler's checks already issued and outstanding for the full fifteen year period"); *see also id.*, p. 17 ¶ 84] Thus, although it is undisputed that the legislation may cause AmEx economic harm, it does not effect a regulatory taking. *See Penn Cent.*, 438 U.S. at 124-25 (explaining that the Supreme Court has "recognized, in a wide variety of contexts, that government may execute laws or programs that adversely affect recognized economic values," including cases in which "th[e] Court has dismissed 'taking' challenges on the ground that, while the challenged government action caused economic harm, it did not

interfere with interests that were sufficiently bound up with the reasonable expectations of the claimant to constitute 'property' for Fifth Amendment purposes").

### D. Commerce Clause

AmEx's newest claim – that the legislation violates the Commerce Clause – also fails. Such claims are analyzed using a two-part test.

> The first inquiry requires a court to determine whether a state statute directly regulates or discriminates against interstate commerce, or whether its effect is to favor in-state economic interests over out-of-state interests. If a state statute does either, it is generally struck down without further inquiry. But if the statute has only indirect effects on interstate commerce and regulates evenhandedly, a court then moves on to the second inquiry, which requires the application of the balancing test set forth in *Pike v. Bruce Church, Inc.* That test upholds a state regulation unless the burden it imposes upon interstate commerce is clearly excessive in relation to the putative local benefits.

*Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010) (internal quotation marks and citations omitted). Under the first prong of the Commerce Clause analysis, a state statute is "virtually per se invalid" if it "has the practical effect of controlling commerce that occurs entirely outside of the state in question," *id.* at 645; "'a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority.'" *Id.* at 646 (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989)). AmEx's primary contention is that Kentucky's abandoned-property law has such an extraterritorial effect.

### 1. Direct Effects

AmEx asserts that the practical effect of the legislation is to control commercial activity outside of Kentucky. If it chose not to honor TCs between seven and fifteen years old, AmEx

argues, merchants would stop accepting TCs as payment, and the entire industry would collapse.[7] It acknowledges, however, that such a scenario is "unlikely." [Record No. 78-1, p. 37; Record No. 78-3, p. 2 ¶ 7] And the hypothetical refusal makes little sense: customer-satisfaction issues aside, AmEx would reap no apparent benefit by refusing to honor TCs more than seven years old, because it would have already turned over the money for those checks to the state. AmEx concedes that it "can no more refuse payment on checks presumed abandoned after 15 years than it can those presumed abandoned after seven years." [Record No. 78-1, p. 37] Thus, while it may cut into AmEx's profits, the legislation does not "fundamentally alter[]" the way the company does business [*id.*]; instead, it merely changes the timing of AmEx's obligation to relinquish the funds for uncashed TCs.

In any event, AmEx pokes a large hole in its own argument by admitting that it has no way of knowing a TC's age at the time of payment. [*See* Record No. 85, p. 6 ("[O]nly after making . . . payment can AmEx determine, from its records, the date and place of sale of the traveler's check, and whether or not the amount of the traveler's check has been paid to any state as unclaimed property.")] Thus, the company is incapable of carrying out its threat to stop honoring TCs affected by the statutory change. Because this claimed effect on interstate commerce is not merely speculative but impossible, it does not support AmEx's Commerce Clause claim. *See Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kan.*, 489 U.S. 493, 525

---

[7] AmEx recognizes that any refusal to accept older TCs would be a business decision on its part, as opposed to a necessary result of the legislation. [*See* Record No. 78-3, p. 2 ¶ 7 ("[T]he burden placed on AmEx by the Legislation at issue here, especially if compounded by similar legislative enactments in other states, could make the TC business so unprofitable that AmEx would make a business decision to stop honoring TCs representing funds presumed abandoned by Kentucky and/or other states.").]

(1989) (finding no *per se* Commerce Clause violation where alleged consequences of challenged law were "pure speculation, contingent upon" possible decisions by third parties); *see also Am. Trucking Ass'ns v. Mich. PSC*, 545 U.S. 429, 436 (2005) (rejecting plaintiffs' contention that they were not required to provide proof "demonstrat[ing] the existence of a burdensome or discriminatory impact upon interstate [commerce]" to prevail on their Commerce Clause claim).

AmEx's second argument is no more persuasive. "[T]o make up for the loss of revenue caused by the [l]egislation," the company asserts, it "may be forced to charge a fee for selling TCs throughout the United States." [Record No. 78-1, p. 38] According to AmEx, such a "change in [its] proven business model" amounts to the legislation "govern[ing] commerce wholly external to Kentucky." [*Id.*] Again, however, AmEx bases its challenge not on any express or implied requirement set forth in the legislation, but rather a course of action it might voluntarily undertake in response to the new law. This case thus differs from *Healy*, for example, which struck down a Connecticut law prohibiting the sale of beer in nearby states at prices higher than those charged in Connecticut. *See* 491 U.S. at 339-40. Likewise, the statute held unconstitutional in *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), "forc[ed] . . . merchant[s] to seek regulatory approval in one State before undertaking a transaction in another." *Id.* at 582. In each of those cases, the statute at issue "directly control[led]" commercial activities outside the state that enacted it. *Healy*, 491 U.S. at 336 ("The critical inquiry is whether the practical effect of the regulation is to *control* conduct beyond the boundaries of the State." (emphasis added)). Here, by contrast, the purported effects

on interstate commerce merely represent AmEx's possible — and, by its own admission, unlikely — reactions to the law, rather than obligations imposed by the law itself.

Moreover, as the Treasurer points out, AmEx has previously admitted (and does not deny here) that it could pass on any costs of the legislation to TC customers in the affected state or bear those costs itself. *See Sidamon-Eristoff*, 669 F.3d at 373 ("[B]y Amex's own admission, the costs of compliance could be passed on to New Jersey travelers check customers or be absorbed by issuers like Amex."). Presumably, charging a fee would not destroy AmEx's traveler's-check business, since some TC customers already pay fees. [*See* Record No. 78-1, p. 8 (explaining that "AmEx charges no fee for TCs," but "[t]he bank or selling agency may charge a modest administrative fee, which it retains")] Because AmEx has offered only unlikely and highly speculative examples of incidental impacts the legislation could have on interstate commerce, and no evidence that the law would have "the practical effect . . . of control[ling] conduct beyond the boundaries of" Kentucky, *Healy*, 491 U.S. at 336, the Court finds no *per se* violation of the Commerce Clause.

### 2. Indirect Effects

This leaves the *Pike* test, which balances "the burden [legislation] imposes upon interstate commerce" against the law's "'putative local benefits.'" *Boggs*, 622 F.3d at 644 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Generation of revenue "is a cognizable benefit for purposes of the *Pike* test." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007). In AmEx's view, the benefits to Kentucky are merely "a small increase in revenue and the protection of 0.4% of outstanding TCs in the event of a

cataclysmic economic collapse." [Record No. 89, p. 15] It contrasts these minimal advantages with the "drastic" effects on interstate commerce it portends, namely, the possible imposition of a nationwide fee on TCs and ultimately, destruction of the entire industry. [*Id.*] As explained above, however, while AmEx could choose to start charging fees on TCs to counteract the lost profits it may suffer as a result of the legislation, the law does not require it to do so.[8] Likewise, the collapse of the traveler's-check industry is not a foregone conclusion if AmEx is forced to turn over TC funds at the seven-year mark.[9] Because AmEx has failed to show that the legislation imposes any burden on interstate commerce, much less one that is "clearly excessive" as compared to the law's benefits, *Boggs*, 622 F.3d at 644, its claim cannot survive the *Pike* test.

### III.

Based on the foregoing analysis, it is hereby

**ORDERED** as follows:

(1)  AmEx's Motion for Summary Judgment [Record No. 78] is **DENIED**.

(2)  The Treasurer's Motion for Summary Judgment [Record No. 88] is **GRANTED**.

(3)  All claims having been resolved, this matter is **DISMISSED** and **STRICKEN** from the Court's docket. A final and appealable judgment will be entered this date.

---

8  The absence of any such requirement, direct or indirect, is reflected in the hypothetical nature of AmEx's arguments that it "*may* be forced to impose a national fee" and "*may* lose the economic incentive to stay in this business, ending the TC industry in the United States altogether." [Record No. 89, p. 15 (emphasis added)]

9  Indeed, as the Treasurer points out, the industry — AmEx included — managed to survive before 1976, when the statutory abandonment period for traveler's checks in Kentucky was increased from seven years to fifteen years. [*See* Record No. 88-1, pp. 2-3 (citing 1960 Ky. Acts 142); *see also* Declaration of James M. Campbell (AmEx Vice President – Finance), Record No. 78-3, p. 1 ¶ 3 ("AmEx has issued Traveler's Cheques ("TCs") since the nineteenth century and is the world's largest issuer of TCs.").]

This 12th day of September, 2012.

